Filed 9/6/22  Lohman v. City of Mountain View CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ANNIE LOHMAN, | H046681, H046831 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 16CV292398) |
| v. | |
| CITY OF MOUNTAIN VIEW et al., | |
| Defendants and Respondents. | |

Plaintiff Annie Lohman sued the City of Mountain View (the City) and Max Bosel (Bosel, collectively respondents) alleging causes of action for sexual harassment, retaliation, and failure to prevent harassment and retaliation, pursuant to the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), among other claims.  The superior court granted the summary judgment motion filed by respondents as to all six causes of action asserted in Lohman's complaint.

On appeal, Lohman challenges the trial court's judgment as to three of the six causes of action, those for sexual harassment, retaliation, and failure to prevent harassment or retaliation.  Lohman first contends the trial court erred by applying the incorrect burden of proof when it found her cause of action for sexual harassment was barred by the statute of limitations.  Lohman further alleges the trial court erred when it granted summary judgment on her cause of action for retaliation, as she engaged in protected activity that was linked to adverse employment action and she demonstrated that any legitimate business reasons for her demotion were pretextual.  Based on these

alleged errors, Lohman argues the trial court erred when it entered judgment on the cause of action for failure to prevent harassment or retaliation.  Finding no error, we affirm the judgment.

Following entry of judgment, respondents sought an award of prevailing party costs.  In response to Lohman's motion to strike or tax costs, the trial court determined that respondents could recover costs as the prevailing party on Lohman's cause of action for violation of Labor Code section 1197.5, California's Fair Pay Act.  Lohman argues the trial court incorrectly interpreted the statute allowing respondents to recover costs. We agree and reverse the costs award.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.  *Facts Related to Summary Judgment Motion*

We take the following facts related to the grant of summary judgment from the parties' separate statements of undisputed material facts, evidence admitted in connection with the summary judgment motion, and admissions in the parties' briefs.  (See *Thompson v. Ioane* (2017) 11 Cal.App.5th 1180, 1186, fn. 4.)

### 1.  *Lohman's Experience with the SWAT team*

The City employed Lohman from February 2003 through May 2018.  She was promoted to a lead public safety dispatcher in 2005, a position she held until her demotion in 2016.  She was assigned to the SWAT team as a tactical dispatcher from 2005 to 2016.

During her assignment as a SWAT dispatcher, Lohman was one of three women. As a SWAT team member, Lohman claims she was "subjected to sexually explicit banter, lewd jokes, nudity, and simulated sexual acts.  Chief Bosel, who was the SWAT team leader at the time, not only did nothing to stop this behavior, but actively encouraged it."

---

[1] We address only the factual and procedural history relating to the issues raised on appeal.

2

Lohman was required to attend yearly out-of-town training exercises, at which the team often held off-site parties. Lohman alleges she was exposed to "outrageous and obscene conduct" at the trainings and related events. Male team members would remove their clothes, engage in sexually suggestive conduct, "flash" or "moon" while in the presence of Lohman and other team members, take photographs of their genitals and show the pictures to Lohman and other female team members, and engage in "initiations" or "hazings" of newer team members. Lohman and other women on the team felt they were treated as the male team members' "eye candy." Men would grope them while acting as "hostages" in role playing exercises at the SWAT trainings.

At times Lohman considered many members of the SWAT team to be her friends. She socialized with members at her home. She engaged in a romantic relationship with another member of the team. However, Lohman believed she had to participate in these objectionable SWAT team events to remain a trusted member of the team. Lohman understood that team members were not to discuss these after-hours activities outside of the team. Her belief was confirmed by Bosel. Lohman feared she would suffer employment-related retribution if she did not attend the events, or if she complained about the conduct of the team members at these events.

Bosel was a member of the SWAT team from 1997 to 2007. He was the tactical commander of SWAT in 2006, but resigned from SWAT in 2007 when the City promoted him to captain. While assigned to the SWAT team, Bosel actively participated in and encouraged the after-hours team events. Bosel and other team members would refer to Lohman and other female dispatchers as "SWAT twats." Although Lohman could not remember specific dates, she testified that on occasions between 2006 and 2015, Bosel flirted with her, made comments about her physical appearance, hugged her, and rubbed her shoulders or feet. In 2012 or 2013, Lohman stopped socializing with members of the SWAT team because she no longer wanted to tolerate their behavior. She did not communicate this directly to Bosel, but believed it was apparent to many

3

people in the department that her behavior changed.  She no longer participated in the "sexual banter or flirtations."  Lohman did not formally report any alleged discrimination or harassment between 2006 and 2015.

## 2. *Lohman's Performance History*

Bosel commenced supervising the communications unit where Lohman worked in August 2012.  He learned about Lohman's relationship with a member of the SWAT team in early 2013.  Lohman contends Bosel asked her at that time to voluntarily demote due to her "personal life," but Lohman declined.  Lohman also felt Bosel targeted her when he took over the division, as her work and performance were "evaluated and scrutinized differently than [her] coworkers or peers."  In December 2012, Bosel requested copies of Lohman's computer log in times to compare them to her work schedule, something he did not do for other dispatchers.

Despite receiving a positive rating in an evaluation addressing her performance from July 1, 2012, through June 30, 2013, in August 2013, Lohman received verbal counseling from a supervisor appointed by Bosel who reported directly to him.  During the counseling, the supervisor noted that Lohman had misspelled a subject's name for a warrant check, allowing an outstanding warrant to go undiscovered until after the subject was placed on a Welfare and Institutions hold.  Lohman had made a similar error in June 2013, which was noted in the July 2013 evaluation.  The supervisor raised Lohman's ongoing pattern of errors in administrative tasks such as timecard completion, as well as incorrect entry of information into the California Law Enforcement Telecommunications System, although similar errors had previously been addressed in the July 2013 evaluation.

During the August 2013 counseling, the supervisor also noted several new issues that had arisen in Lohman's work since the July 2013 performance evaluation.  A review of seven random emergency medical dispatch (EMD) calls taken by Lohman revealed protocol errors in six of the calls.  Three were scored as non-compliant with applicable

4

call standards. The supervisor indicated that Lohman had not completed the required review of the EMD calls for the dispatchers she supervised. The supervisor also addressed concerns with Lohman's handling of priority radio traffic in August 2013. The supervisor concluded, "These repeated errors are unacceptable performance for a dispatcher and especially for a supervising dispatcher. It is my hope that our previous discussions, your evaluation, and now this counseling memo will impart to you the importance of accuracy and make you more cognizant to avoid future errors. Effective immediately, it is imperative you pay close attention to your work performance, including but not limited to, meeting the standards of a Lead Public Safety Dispatcher."

Despite the concerns expressed by Lohman's supervisor, Lohman was given additional administrative duties, including the responsibility to create and maintain the communication department's schedule. Lohman's supervisor rejected offers by another dispatcher to assist Lohman. Lohman made frequent errors on the schedule. Other employees were not reprimanded for errors they made in completing collateral assignments.

In March 2014, Lohman's supervisor and one of her coworkers praised Lohman for her performance in response to two critical call situations. In April 2014, the City placed Lohman on a Performance Improvement Plan (PIP), asserting Lohman did not meet the stated standards in interpersonal effectiveness/work relationships, job knowledge, skills and abilities (based on Lohman's continued struggle to accurately complete timecards), and supervisory skills (based on 46 scheduling errors). The PIP set forth the performance standards Lohman was expected to meet by the completion of the PIP on June 30, 2014. The PIP indicated that "failure to meet or maintain these standards could result in disciplinary action, up to and including termination." When Lohman met with Bosel to discuss the PIP, he stated that "there was nothing wrong with stepping down" if her "heart wasn't in [the job]." Lohman informed Bosel that she loved her job and was confident in her abilities.

5

Although she required an extension, Lohman successfully completed the PIP. In September 2014, Lohman received her annual performance review, covering the period from July 1, 2013, through June 30, 2014. Bosel approved the supervisor's review of Lohman for content. The supervisor gave Lohman scores of "needs improvement" in the categories of interpersonal effectiveness, job knowledge, skills, and abilities, and supervisory skills. In the text of the review, the supervisor stated that Lohman had been placed on a PIP due to her deficiencies in these areas and had completed the PIP in August 2014. Lohman's supervisor anticipated the evaluation ratings would be higher at the next annual review.

Following Lohman's completion of the PIP, the City claimed it received additional complaints about Lohman's performance. In late August 2014, Lohman failed to ask for the name of a caller providing information about a homicide that had occurred the previous night. Lohman failed to comply with her dispatcher duties in several incidents in October and November 2014. One of Lohman's subordinates reported in November 2014 that Lohman would often unplug from the console and leave her position without asking a coworker to cover her channel. Lohman would also receive visits from the member of the SWAT team with whom she had a romantic relationship.

Lohman was told by another dispatcher that Lohman's supervisors solicited complaints from members of the dispatch team. In December 2014, the City informed Lohman and her boyfriend that the City's nepotism policy prevented them from working together on the same weekend night shifts, although they had been doing so for at least a year. One of Lohman's coworkers testified that she was aware of other couples who worked together without having the nepotism policy enforced against them, although she did not indicate that these couples were working together at the time the City enforced the policy against Lohman.

In January 2015, Lohman failed to dispatch units to the correct address of a possible drowning victim, failed to dispatch a fire rescue apparatus to assist in another

6

call, failed to provide EMD instructions for a patient at a fitness center who was unconscious and turning purple, and failed to create an event for a disturbance call at a grocery store. Between November 2014 and January 2015, Lohman's supervisors met with her repeatedly to discuss all of these issues. Based on these complaints, the department reviewed a week's worth of Lohman's calls from late-January and early-February 2015, discovering eleven additional calls with "similar repetitive errors in the following categories: maintaining the status of first responders, sending appropriate resources, creating events as appropriate, confirming and parroting officer information, basic call taking and questioning, and relaying accurate information."

On February 5, 2015, the City placed Lohman on paid administrative leave. Lohman learned of this decision after receiving a department-wide email notifying the department of her administrative leave status. On the date Lohman was placed on leave, her direct supervisor made a note in the department's "performance tracker" tool praising Lohman for her work from the prior week.

### 3. *Lohman's Discrimination and Harassment Complaints and Subsequent Activity*

On April 8, 2015, Lohman, through a representative, sent a letter to the City's human resources manager alleging, "Since 2010 Lead Lohman has been the victim of a hostile work environment, toxic work environment, unwanted sexual advances, sexual harassment, and work place bullying." Lohman did not allege that Bosel engaged in quid pro quo sexual harassment but stated that she was being held to a different standard than a male peer by being placed on a PIP. She also claimed that Bosel's reason to put her on a PIP was his desire to eliminate leads in the communications department. Lohman claimed that Bosel created a hostile work environment by notifying the department of her administrative leave and treating her differently than other employees that had been placed on leave. Lohman was concerned that the "ultimate goal [was] to terminate or demote her at any cost[s] and to replace her with someone who will 'keep the code of

7

silence' that exists in her toxic work environment." She asked the City to engage an independent party to conduct an investigation.

The City complied with Lohman's request and hired an independent investigator to review Lohman's complaints. The City put its disciplinary process on hold during the pendency of the investigation. The investigator determined Lohman's allegations were not substantiated, and the City proceeded with its disciplinary process.

Prior to the completion of the investigation, on May 11, 2015, Lohman filed a charge of discrimination against the City with the EEOC. She alleged that she was being treated differently than a male coworker, and that she was being retaliated against for complaining about discrimination.

In July 2015, the day after the City notified Lohman that the investigation was complete, the City, in a memorandum signed by Bosel, notified Lohman of its intention to demote her "with a dedicated training program," and to remove her from the SWAT team for an "undetermined period of time." Bosel stated, "Throughout 2013 and 2014, concerns with safety risks associated with your dispatching performance arose due to complaints from Police Lieutenants, Police Sergeants and Fire Command staff regarding your call handling. In addition, your errors reflect negatively on our service to the public, breaking our commitment to excellent service, and do not meet dispatch performance standards of providing exceptional service." Noting that Lohman was counseled regarding each call, Bosel detailed the various complaints supporting the decision to place Lohman on administrative leave and demote Lohman. Bosel also expressed concern regarding deficiencies in Lohman's supervisory skills, including complaints that Lohman allowed personal matters to impact her ability to be an effective dispatcher and supervisor. Due to Lohman's years of experience with the City, Bosel determined that a demotion with a training period for up to one year was an appropriate disciplinary measure, rather than termination. He offered Lohman the opportunity to voluntarily demote with the stated training plan, but her "salary would be Y-rated at [her current

8

salary] in effect as of the date of [the administrative leave]." He notified Lohman that further violations of City policies or failure to meet job standards would result in discipline, up to and including termination. Bosel afforded Lohman the opportunity to respond to the charges orally or in writing. He also set a meeting with the acting fire chief, at which Lohman could appear with an attorney or other representative.

In September 2015, Lohman's attorney sent a letter to the City's attorney raising new complaints of sexual harassment, gender discrimination, disability discrimination and equal pay violations against the City and Bosel. In October 2015, Lohman filed a complaint of discrimination with the Department of Fair Employment and Housing, restating those allegations. Shortly thereafter, the EEOC issued a dismissal and notice of rights, closing its file on Lohman's charge on the basis that, "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."

The City reissued its notice of intended discipline to Lohman in March 2016 and scheduled a *Skelly* hearing.[2] Lohman, through counsel, challenged the demotion. In May 2016, the City's director of library services, sitting as the *Skelly* officer, upheld the City's proposed discipline, noting she was "surprised that termination was not proposed in the Notice of Intended Discipline," given Lohman's "extensive mistakes resulting in safety risks to first responders and members of the public. . . ." The officer notified Lohman that she could contact the human resources manager to receive a return to work date if she elected not to appeal the notice of discipline. The City notified Lohman that she should return to work on May 31, 2016, at the demoted title and decreased salary.

---

[2] In *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 215, the California Supreme Court determined that the minimum procedural due process protections required before disciplinary action becomes effective include "notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline."

Lohman returned to work as ordered. Lohman alleged that during the time she completed the required training program, she was treated differently than other employees and held to a different standard than her peers. Lohman did not lodge any complaints of discrimination to human resources. Lohman's health deteriorated after returning to work; she took medical leave in February 2017, and resigned from the City effective May 21, 2018.

## B. Lohman's Lawsuit

### 1. Complaint

Lohman filed a civil complaint against respondents in March 2016, alleging causes of action for retaliation, sexual harassment, gender discrimination, disability discrimination, and failure to prevent harassment, discrimination and retaliation, all in violation of FEHA. In addition to the FEHA claims, Lohman alleged a cause of action for violation of the Fair Pay Act (FPA) under Labor Code section 1197.5. At the time Lohman filed the suit, she was on paid administrative leave from her employment with the City. After Lohman was demoted in May 2016, she filed a supplemental complaint, alleging the same causes of action. In the May 2016 complaint, Lohman generally alleged that she had "been repeatedly subjected to sexually explicit banter, lewd jokes, nudity, and simulated sexual acts. Chief Bosel, who was the SWAT team leader at the time, not only did nothing to stop this behavior, but actively encouraged it." Lohman claimed that Bosel "no longer perceived [Lohman] as a willing participant in his inappropriate conduct" after Lohman's relationship with another SWAT team member became known. Lohman "was no longer willing to be subject to, and resisted, the unlawful, inappropriate conduct. Thereafter, [Bosel] demonstrated a clear animus towards [Lohman]." Lohman contended that she was subjected to "intense scrutiny and meritless investigations" after Bosel took over direct leadership of the division to which Lohman was assigned, none of which led to findings of misconduct. She further alleged that her supervisors acted at the "urging and insistence of [Bosel]" in attempting to

"paper [Lohman's] file with disciplinary memoranda" in an effort to remove Lohman from the department.

Regarding the specific causes of action at issue in this appeal, Lohman alleged that she "exercised her rights and engaged in activities protected by the [FEHA] by refusing to engage in unlawful conduct, submitting a complaint to Human Resources complaining of conduct which plaintiff believed was unlawful, and challenging the City's proposed demotion," resulting in the City making "decisions adverse to [Lohman] in regards to the terms, conditions, or privileges of employment" which were motivated by Lohman's refusal to engage in unlawful conduct and her complaints about such conduct. Concerning the sexual harassment cause of action, Lohman contended that "Bosel made unwanted sexual advances to [Lohman] and engaged in other unwanted verbal or physical conduct of a sexual nature," and that respondents' "employment decisions affecting [Lohman] were made based on her acceptance or rejection of [Bosel's] sexual advances and conduct." Claiming that she was subjected to harassment and retaliation in the course of her employment with the City, Lohman argued that the City failed to take reasonable steps necessary to prevent said harassment and retaliation. In addition to the FEHA claims, Lohman alleged that the City violated the FPA as stated in Labor Code section 1197.5 by paying her less than her male counterpart for substantially similar work.

Respondents answered Lohman's supplemental complaint in April 2017, generally denying the allegations, and raising several affirmative defenses. Relevant to this appeal, respondents claimed Lohman failed to state facts sufficient to constitute a cause of action against respondents, that some or all of her claims were barred by the applicable statutes of limitation, and that respondents' actions were reasonable in response to legitimate business necessity and taken in good faith. Respondents also alleged that any actions complained of were motivated by legitimate, nondiscriminatory, nonretaliatory reasons.

11

## 2. *Respondents' Motion for Summary Judgment*

Respondents filed a motion for summary judgment as to each of Lohman's stated causes of action. They alleged that the cause of action for sexual harassment was barred by the statute of limitations, and that Lohman could not "establish the necessary elements to prove her sexual harassment claim because she present[ed] no evidence of severe or pervasive conduct that altered her work environment." Respondents argued that Lohman could not establish the necessary elements of the retaliation claim, because she could not establish a nexus between her complaints and her demotion, and she could not establish pretext.

Lohman opposed the motion for summary judgment. She argued that respondents moved for summary judgment based on the wrong claim of sexual harassment; while their motion focused on a claim for hostile work environment harassment, Lohman pleaded a cause of action for quid pro quo harassment. Lohman contended that she timely raised her claim for quid pro quo harassment. She also alleged that there existed multiple disputed issues of material fact relevant to her claim for retaliation, claiming she had engaged in three acts of protected activity and had provided evidence of pretext.

Respondents first addressed Lohman's quid pro quo sexual harassment claim in reply to Lohman's opposition. They contended that Lohman failed to show that she was subject to such harassment within one year of filing her EEOC complaint, or that she was subject to any unwanted sexual advances towards her by Bosel. With respect to the retaliation claim, respondents argued that Lohman did not engage in protected activity prior to April 2015, and that she did not establish a causal link between her conduct after that time and the City's decision to demote her.

## 3. *Trial Court's Order*

The trial court granted summary adjudication on the cause of action for sexual harassment, finding that Lohman did not timely file a complaint with the Department of Fair Housing and Employment, as required by Government Code section 12960,

subdivision (d).  As Lohman filed her complaint on October 23, 2015, the court determined that the alleged sexual harassment had to have occurred after October 23, 2014.  The court cited to respondents' statement of undisputed facts in support of the motion to address Lohman's allegations that SWAT team members subjected her to inappropriate conduct from 2005 to at least 2010.  Based on Lohman's contention in opposition to the summary judgment motion that she was claiming quid pro quo harassment, not hostile work environment harassment, the court considered the limited facts proffered by respondents on this claim, as well as the facts submitted by Lohman to determine that, "[o]ther than [Lohman's] speculation, there simply is no evidence from which a trier of fact can reasonably conclude that the negative personnel decisions taken against [Lohman] are related to [Lohman's] refusal to submit to defendant Bosel's sexual conduct."  As there was no conduct, other than the negative personnel decisions, that was alleged to have taken place after October 23, 2014, the trial court found the sexual harassment cause of action to be time barred, and granted summary adjudication on that cause of action.

Regarding Lohman's cause of action for retaliation, the trial court determined that Lohman's decision to withdraw from SWAT team activities in 2013 did not constitute protected activity under Government Code section 12940, subdivision (h).[3]  The court found that there was no causal link between Lohman's protected activity and any adverse employment action that commenced prior to April 2015.  The court also found that the notice of intended discipline was not a forbidden employment practice, such that Lohman's challenge to the notice did not constitute protected activity under the statute.  Because the court granted summary adjudication of Lohman's harassment and

---

[3] Subdivision (h) of Government Code section 12940 makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [the FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [the FEHA]."

13

discrimination causes of action, it similarly granted the motion as to the failure to prevent cause of action. The court also granted the motion as to Lohman's FPA cause of action.

In conformance with the order granting respondents' motion for summary judgment, the trial court entered judgment in favor of respondents in November 2018, indicating that respondents would recover costs pursuant to Code of Civil Procedure section 1032 et seq. Respondents filed a memorandum of costs, seeking over $60,000. Lohman filed a motion to strike or tax costs. Following a hearing, the trial court granted in part and denied in part Lohman's motion to strike or tax costs.[4]

## II. DISCUSSION

### A. *Summary Judgment*

#### 1. *Standard of Review*

We review the trial court's grant of summary judgment on Lohman's causes of action for sexual harassment and retaliation de novo. Thus, we "independently determine whether an issue of material fact exists and whether the moving party is entitled to summary judgment as a matter of law. [Citation.] 'We independently review the parties' papers supporting and opposing the motion, using the same method of analysis as the trial court. Essentially, we assume the role of the trial court and apply the same rules and standards.' [Citation.]" (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493-494.) We consider all of the evidence set forth in the moving and opposing papers, except the evidence to which objections were made and sustained, but we liberally construe the evidence in support of the party opposing summary judgment, resolving doubts concerning the evidence in favor of that party. (Code Civ. Proc., § 437c, subd. (c); *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1039 (*Hughes*).) We are not bound by the trial court's stated reasons or rationales. As we review the ruling, not the rationale, we are not concerned with the findings made by the trial court in support of its

_____

[4] This court ordered the appeal from the November 2018 judgment and the appeal from the costs order considered together for purposes of oral argument and disposition.

14

ruling.  (*Castillo v. Glenair, Inc.* (2018) 23 Cal.App.5th 262, 284-285 (*Castillo*), disapproved on another ground in *Grande v. Eisenhower Medical Center* (2022) 13 Cal.5th 313, 332.)

### 2.  *Sexual Harassment Cause of Action*

"California law prohibits sexual harassment in the workplace.  Originally enacted in 1980, Government Code section 12940 is part of the FEHA.  (See Gov. Code, § 12900 et seq.)  . . .  Since 1985, the FEHA has prohibited sexual harassment of an employee. (See Gov. Code, § 12940, subd. (j)(1).)  [¶] . . .  [T]he prohibited conduct ranges from expressly or impliedly conditioning employment benefits on submission to, or tolerance of, unwelcome sexual advances to the creation of a work environment that is 'hostile or abusive to employees because of their sex.'  [Citation.]  Thus, . . . California's FEHA 'recognize[s] two theories of liability for sexual harassment claims . . . ". . . quid pro quo harassment, where a term of employment is conditioned upon submission to unwelcome sexual advances . . . [and] hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment." '  [Citations.]"  (*Hughes, supra,* 46 Cal.4th at pp. 1042-1043.)

The two theories of sexual harassment liability require proof of different elements. "[A] hostile work environment sexual harassment claim requires a plaintiff employee to show she was subjected to sexual advances, conduct, or comments that were (1) unwelcome [citation]; (2) because of sex [citation]; and (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment [citations].  In addition, she must establish the offending conduct was imputable to her employer.  [Citation.]"  (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 279 (*Lyle*).)  A party alleging quid pro quo sexual harassment "must show 'that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands.'  [Citations.]"  (*Hughes*, *supra*, 46 Cal.4th at p. 1049.)

15

Lohman asserts that the grant of summary adjudication of her harassment claim must be reversed because the trial court placed the burden on her to demonstrate a prima facie claim of quid pro quo sexual harassment, rather than requiring respondents to show that Lohman had not made a prima facie claim. She correctly observes that respondents, as the moving party, bear the burden of showing that Lohman has not established a prima facie case, and cannot reasonably expect to establish such a case. (*Lyle*, *supra*, 38 Cal.4th at p. 274.) Once the moving party has shown that one or more element of a cause of action cannot be established, the burden then shifts to the plaintiff to show the existence of a triable issue of fact. (*Ibid.*) Based on these precepts, Lohman argues that respondents did not meet their initial burden.

Respondents' motion for summary judgment asserted that Lohman failed to establish the necessary elements for a claim of hostile work environment sexual harassment. However, while Lohman set forth "general allegations" in her complaint that could be construed as descriptions of a hostile work environment, in setting forth her cause of action for sexual harassment, Lohman clearly alleged quid pro quo sexual harassment, claiming "Chief Bosel made unwanted sexual advances to plaintiff and engaged in other unwanted verbal or physical conduct of a sexual nature," and "Defendants' employment decisions affecting plaintiff were made based on her acceptance of Chief Bosel's sexual advances and conduct."[5] Lohman opposed the motion in part on this basis, claiming that the trial court should deny the request for summary judgment because the respondents moved for summary adjudication based on the wrong claim of sexual harassment. Thus, it was not until their reply that respondents explicitly contended that Lohman had failed to establish elements necessary to prove quid pro quo harassment. Because the trial court considered respondents' reply, as well as evidence related to the quid pro quo harassment claim that she herself provided in her

[5] Lohman confirmed in response to respondents' motion for summary judgment that she was not alleging hostile work environment sexual harassment.

16

opposition to the summary judgment motion, Lohman contends that the trial court erred, compelling reversal.

Lohman's analysis is flawed. On appeal of the grant of a summary judgment we conduct an independent review of all of the evidence and are not bound by the trial court's determinations. (Code Civ. Proc., § 437c, subd. (c); *Hughes*, *supra*, 46 Cal.4th at p. 1039; *Castillo*, *supra*, 23 Cal.App.5th at pp. 282-283.) We may consider "evidence . . . not submitted with moving party's separate statement, but [that] was otherwise submitted with the parties' papers on summary judgment." (*Castillo*, *supra*, at pp. 282-283.) This includes the evidence Lohman elected to submit, as well as the totality of evidence submitted by respondents, whether identified as undisputed material facts related to the quid pro quo action or not.

We note that in the trial court Lohman did not rest on respondents' failure of proof. Lohman had no duty to controvert any of respondents' assertions unless and until respondents met their initial burden to either establish a complete defense to Lohman's claim, or to show that one or more elements of the claim could not be established. (Code Civ. Proc., § 437c, subd. (p)(1) & (2); *Rutledge v. Hewlett-Packard Co.* (2015) 238 Cal.App.4th 1164, 1170 (*Rutledge*).) Nonetheless, she elected to set forth the facts which she believed demonstrated the existence of triable issues of material fact concerning her quid pro quo harassment cause of action, including setting forth evidence of the conduct Bosel engaged in which she contends constituted quid pro quo harassment. She not only responded to respondents' statement of undisputed material facts, she cited additional undisputed material facts in opposition to the motion for summary judgment. Under *Castillo*, this evidence is part of the record we consider in assessing whether an issue of material fact exists with respect to the quid pro quo sexual harassment claim. Thus, to the extent respondents failed initially to submit sufficient evidence in support of their motion for summary adjudication of that claim, on appeal we can consider the evidence Lohman submitted in response.

17

The appellate court also can affirm an order granting summary judgment or summary adjudication on a ground not relied on by the trial court after affording the parties an opportunity to present their views through supplemental briefs. (Code Civ. Proc., § 437c, subd. (m)(2).) We requested and received supplemental briefs addressing "whether, on the record before this court, there exists a triable issue as to any material fact concerning [the quid pro quo] cause of action." In her brief, Lohman did not argue "that additional evidence relating to that ground exists, but [she] has not had an adequate opportunity to present the evidence or to conduct discovery on the issue," as allowed by Code of Civil Procedure section 437c, subdivision (m)(2). Instead, she set forth the evidence in the record that she contends substantiates the existence of "multiple triable issues of material fact as to the quid pro quo cause of action." We thus review de novo the totality of the evidence in the summary judgment record before us to determine whether respondents have demonstrated that Lohman did not make a prima facie quid pro quo sexual harassment claim.

Respondents first argue that they have a complete defense to the cause of action because the sexual harassment claim is time barred. At the time of the alleged misconduct here, the FEHA provided that a person claiming to be aggrieved by an alleged unlawful practice had to file a verified complaint with the DFEH within one year from the date on which the alleged unlawful practice or refusal to cooperate occurred. (Gov. Code, § 12960, former subd. (d); *Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 931 (*Pollack*).) "A statute of limitations 'does not begin to run until the cause of action accrues,' and a cause of action accrues at the moment when the party alleging injury is entitled to ' " 'begin and prosecute an action thereon.' " ' [Citation.]" (*Pollack*, at pp. 930-931.)

The parties disagree as to when the statute of limitations on Lohman's complaint for quid pro quo sexual harassment began to run. Respondents argue the one-year period commenced when the alleged sexual harassment occurred, while Lohman contends it was

18

the City's decision to demote her in July 2015 that entitled her to begin prosecution of the action. In *Pollack*, the Supreme Court held that a quid pro quo sexual harassment cause of action based on failure to promote "begins to run[] when the aggrieved employee knows or reasonably should know of the employer's decision not to the promote him or her." (*Pollack*, *supra*, 11 Cal.5th at p. 941.)

Assuming, without deciding, that Lohman's claim was brought within the statute of limitations, we conclude there is no evidence in the record that creates a triable issue of material fact supporting the quid pro quo sexual harassment cause of action. While there is evidence that Bosel engaged in flirtatious behavior and physical conduct that Lohman considered unwanted, such as hugs, and shoulder and foot massages, perhaps occurring as late as 2015, the record is devoid of evidence that Lohman refused to submit to sexual demands made by Bosel, let alone that any refusal resulted in her demotion. In other words, the necessary causal link between her rejection of Bosel's conduct and the adverse employment action has not been established.

Lohman alleges that she refused Bosel's advances by withdrawing in the summer of 2012 or 2013 from the SWAT team's social events where pervasive sexual misconduct was encouraged by him. But we do not perceive how Lohman's withdrawal from the SWAT team social activities served as a rejection of Bosel's alleged sexual advances, when Bosel had resigned from the SWAT team at least five years earlier. She did not tell Bosel that she was withdrawing from the SWAT team to distance herself from the inappropriate conduct. She admitted that she did not know how Bosel otherwise would have learned that she had withdrawn from SWAT team activities as she did not communicate this fact directly to him. While Lohman testified that she believed it was apparent to "many people" in the department that her behavior had changed, she did not provide evidence of how her changed behavior would be apparent to Bosel. Further, the first complaint she filed addressing Bosel's conduct did not allege that he engaged in quid

19

pro quo sexual harassment, but rather that he wanted to eliminate lead positions in the communications center.

Viewing the evidence in the light most favorable to Lohman, we conclude that the evidence is insufficient to establish that she communicated her rejection of the SWAT team's behavior and Bosel's conduct, and that her demotion thus was the product of her "refusal to submit to [his] sexual demands." (*Hughes*, *supra*, 46 Cal.4th at p. 1049.) As evidence of a refusal that results in a tangible employment action is essential to a quid pro quo sexual harassment cause of action, Lohman did not establish, and could not reasonably expect to establish, a prima facie showing of this harassment claim. Thus, the trial court properly granted summary adjudication of the quid pro quo sexual harassment cause of action.

### 3. *Retaliation Cause of Action*

Government Code section 12940, subdivision (h) (section 12940(h)), makes it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [the FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [the FEHA]." In order to establish a prima facie retaliation claim at trial, the plaintiff must show "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. [Citations.] Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation. [Citation.]" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).)

However, as the party seeking summary judgment, respondents bear the initial burden to establish that Lohman "cannot establish a prima facie case of retaliation, or that

20

there was a legitimate, nonretaliatory reason for the adverse action." (*Mackey v. Board of Trustees of California State University* (2019) 31 Cal.App.5th 640, 676, citing *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 861.) If respondents meet this burden, they are entitled to summary judgment unless Lohman produces admissible evidence raising a triable issue of material fact to respondents' showing. (*Wilkin v. Community Hospital of the Monterey Peninsula* (2021) 71 Cal.App.5th 806, 828.) As with the cause of action for sexual harassment, we review the trial court's summary adjudication of the retaliation claim de novo, liberally construing the evidence in support of Lohman. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1037.)

We commence by considering respondents' initial burden of presenting admissible evidence negating an essential element of Lohman's retaliation cause of action or establishing a nonpretextual reason for demotion. Respondents argue Lohman cannot demonstrate that she engaged in protected activity prior to the instigation of the adverse employment actions against her, as she did not notify the City of her claims until April 2015. Respondents further argue that Lohman cannot show a causal link between the alleged protected activity and her demotion.

### a. Lohman's Protected Activities

Lohman asserts that she engaged in three protected activities. First, she claims that her withdrawal from participation in activities with the SWAT team in 2012 or 2013 sufficed to establish that respondents knew that the conduct of Bosel and the SWAT team members was inappropriate or impermissible. Second, she argues that her April 2015 complaint of discrimination, harassment, and retaliation made to the City's human resources department, followed by the charge she filed with the EEOC in May 2015, were protected activities. Finally, Lohman contends that her opposition after receiving notice of her demotion in July 2015 qualifies as a protected activity. Respondents do not dispute that Lohman's formal complaints in April and May 2015 constitute protected

21

activity under section 12940(h).  Respondents contend the other activities cited by Lohman do not constitute protected activities for the purposes of a retaliation claim.

Considering the matter de novo, we conclude respondents have met their burden to demonstrate that Lohman's conduct in withdrawing from SWAT activities did not constitute protected activity under section 12940(h).  "Standing alone, an employee's unarticulated belief that an employer is engaging in [forbidden practices] will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in [forbidden practices]." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1046.)  An employee is not required to file a formal charge to qualify as having engaged in protected activity.  But the employee's conduct "must oppose activity the employee reasonably believes constitutes unlawful discrimination, and complaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct.  [Citations.]" (*Id*. at p. 1047.)  We consider whether Lohman's conduct towards respondents prior to April 2015, when she first made a formal complaint, " 'sufficiently convey[ed] [Lohman's] reasonable concerns that [respondents had] acted or [were] acting in an unlawful discriminatory manner.' [Citation.]" (*Ibid*.)

As we have discussed with respect to her quid pro quo sexual harassment claim, here, there is no evidence in the record that Lohman's withdrawal from SWAT activities sufficiently conveyed her concerns that Bosel or anyone else affiliated with the City was engaging in harassment or discrimination against Lohman.  (See Section II.A.2, *ante*.) The evidence is insufficient to show that Bosel or the City knew that Lohman had withdrawn from the objectionable SWAT activities, or that any such change in conduct reflected Lohman's reasonable concerns that Bosel or others were engaging in harassment or discrimination against her.  Absent evidence that Lohman engaged in

22

protected activity prior to April 2015, there is no established link between her alleged withdrawal from the SWAT team's activities and the adverse employment actions taken by respondents. Lohman has not produced admissible evidence raising a triable issue of material fact to respondents' showing on this issue.

As for Lohman's challenge to her demotion after receiving notice of such in July 2015, respondents contend that taking steps to discipline Lohman for failing to meet job expectations is not a practice forbidden by the FEHA, and thus Lohman's challenge to the demotion cannot constitute protected activity under section 12940(h). Respondent provides no authority supporting this interpretation of section 12940(h), and Lohman provides no authority supporting her contention that her activity was protected. But we need not address whether Lohman's challenge to the demotion constituted protected activity. As discussed, *post*, the record demonstrates no causal link between any such protected activity and her ultimate demotion.

### b. Causal Link Requirement

Respondents contend Lohman cannot establish a causal link between her protected activity—specifically the formal complaints made in April and May 2015—and her ultimate demotion because respondents began the disciplinary process against Lohman in 2013, well before Lohman first complained of alleged harassment and discrimination in April 2015. Lohman argues that the proximity in time between her withdrawal from SWAT activities and the onset of the disciplinary actions taken by the City reveals a causal link between the two. Further, she suggests that the timing of continued action by the City after the April 2015 letter and her challenge to the City's demotion decision similarly support a determination that she met her burden to make a prima facie showing of retaliation. We agree that the record does not support a causal link between Lohman's protected activities and the adverse employment actions taken against her.

" 'Close proximity in time of an adverse action to an employee's resistance or opposition to unlawful conduct is often strong evidence of a retaliatory motive.' "

23

(*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1020.) In this case, Lohman's first protected activity occurred in April 2015. However, the City commenced the adverse actions in 2013, well before Lohman's letter complaining of unlawful or inappropriate conduct. The actions the City took after the City received the April 2015 letter, and then later demoted Lohman, were a continuation of conduct it began before Lohman complained.

Lohman cites *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 421 (*Wysinger*), in which the appellate court held, "A long period between an employer's adverse employment action and the employee's earlier protected activity may lead to the inference that the two events are not causally connected. [Citation.] But if between these events the employer engages in a pattern of conduct consistent with a retaliatory intent, there may be a causal connection." We distinguish *Wysinger* on its facts. In *Wysinger*, the protected activity preceded the adverse employment action by several years, during which time the court determined the employer engaged in conduct that reflected retaliatory animus. (*Id*. at pp. 421-422.) Here, the City commenced adverse employment action in 2013, well before Lohman engaged in protected activity. Thus, the temporal proximity of the City's continuing conduct after April 2015 does not provide the causal link that might have otherwise existed had Lohman engaged in protected activity earlier, or had the City not began the adverse action until after April 2015. (See *Nejadian v. County of Los Angeles* (2019) 40 Cal.App.5th 703, 724 ["Because retaliation under FEHA requires the plaintiff to show that the employer was motivated to retaliate by the plaintiff's protected activity, actions the employer took before the plaintiff engaged in the protected activity necessarily are irrelevant."].)

Lohman argues that respondents have not produced any evidence that they decided to demote her before receiving the April 2015 letter or May 2015 EEOC complaint. While Lohman correctly asserts that this court must view the evidence in the light most

favorable to her, which we have done here, the fact remains that the record is replete with undisputed evidence that Lohman had a history of adverse disciplinary action prior to April 2015, when she first engaged in protected activity. Moreover, Lohman herself testified that Bosel suggested the possibility of voluntarily demoting to Lohman two times before she was placed on administrative leave in February 2015, indicating that the possibility of demotion as an outcome had arisen prior to Lohman engaging in protected activity in April 2015.

We find *Diego v. City of Los Angeles* (2017) 15 Cal.App.5th 338 (*Diego*), instructive on this point. In *Diego*, two police officers had been "benched" prior to engaging in protected activity under section 12940(h). The appellate court determined that their continued benching after the engaged in protected activity was not, on its own, sufficient to support a conclusion that the employer's motivation changed after the officers engaged in protected activity. (*Id*. at p. 364.) Rather, the court found the fact that the benching continued, "even for the . . . period that the Officers identify as unusual, is fully consistent with [the employer's] justification . . . ." (*Ibid*.) As the court noted, "[t]he particular significance of causation evidence in retaliation claims is another reason to conclude that the continuation of a preexisting employment status is not in itself sufficient to support such a claim. Absent sufficient evidence of a causal link, employees can, in essence, create a claim by making a complaint or filing a lawsuit before an anticipated adverse employment action occurs. [Citations.] Permitting an inference of retaliation based solely upon the continuation of an already existing adverse employment status creates the same danger that employees might create claims that would not otherwise have any basis, simply by filing a complaint." (*Diego*, at pp. 364-365.)

Lohman points out that the employees at issue in *Diego* were not subjected to new adverse employment action after engaging in protected activity. Rather, the employer simply maintained the status quo, although for an "unusually long period of time." (See *Diego*, *supra*, 15 Cal.App.5th at pp. 363-364.) Because Lohman was on paid leave at the

25

time she made her complaints in April and May 2015, and was only demoted after making the complaints, she argues that the holding in *Diego* does not apply in her case. But the rationale behind the *Diego* court's holding applies here. The facts supporting respondents' decision to place Lohman on paid leave are the same on which respondents based the decision to demote Lohman—conduct Lohman engaged in prior to April 2015. As already noted, Bosel had suggested voluntary demotion to Lohman prior to placing her on administrative leave in February 2015, and prior to the issuance of the notice of intended discipline in June 2015. The demotion was effectively a continuance of the adverse employment actions respondents had already taken against Lohman prior to her engaging in protective activity in April 2015.

We conclude that respondents have met their burden to show that Lohman cannot demonstrate a prima facie claim for retaliation under section 12940(h). Lohman has not produced admissible evidence raising a triable issue of material fact to respondents' showing. The trial court did not err in granting summary adjudication on this cause of action.[6]

### 4. *Failure to Prevent Cause of Action*

Lohman alleged a cause of action for failure to prevent harassment, discrimination, and retaliation pursuant to Government Code section 12900, subdivision

_____

[6] As we have determined that the evidence does not establish a triable issue of material fact as to Lohman's prima facie retaliation claim, we need not consider whether respondents offered a legitimate, nonretaliatory reason for the adverse employment actions, or whether Lohman proved those offered reasons were pretextual. Nor do we consider respondents' contention that by failing to appeal the *Skelly* officer's decision, Lohman failed to exhaust her administrative remedies before filing her complaint. In respondents' brief, respondents claim that this alleged failure to exhaust administrative remedies bars Lohman's claims for sexual harassment *and* retaliation, although they seemingly only offer argument on the issue to the extent we determined there were triable issues of fact regarding the retaliation cause of action. To the extent respondents contend the sexual harassment cause of action is also barred on this basis, they did not raise that issue to the trial court, we will not consider it for the first time on appeal. (*Findleton v. Coyote Valley Band of Pomo Indians* (2018) 27 Cal.App.5th 565, 569.)

(k). On the assumption that we will reverse the trial court's ruling on the sexual harassment and/or retaliation cause of action, she asks to "revive" the claim for failure to prevent as well. Because we affirm the trial court's decision to summary adjudicate both Lohman's quid pro quo sexual harassment and retaliation claims, we also conclude that the trial court did not err in granting summary adjudication on this cause of action.

### B. Costs

Following the judgment, respondents filed a memorandum of costs, seeking over $60,000 in costs. Lohman filed a motion to strike or tax costs. She argued that the award of costs related to her claim under the FPA as established in Labor Code section 1197.5, was governed by Labor Code section 218.5, subdivision (a), which precluded the trial court from awarding costs to a prevailing defendant unless the court found that the plaintiff employee brought the action in bad faith.[7] Respondents disputed the applicability of Labor Code section 218.5, contending that Code of Civil Procedure section 1032, subdivision (b) provided the trial court authority to award costs on Lohman's failed FPA claim. In reply, Lohman argued that the general prevailing party costs provision of Code of Civil Procedure section 1032 did not apply because the FPA only allows a prevailing *employee* to recover costs, not a prevailing *employer*.

Following a hearing, the trial court granted in part and denied in part Lohman's motion to strike or tax costs. The court found that Labor Code section 1197.5 did not expressly exclude prevailing employers from recovering their costs, and thus did not constitute an express exception to the general rule permitting a prevailing party to recover costs under Code of Civil Procedure section 1032, subdivision (b). While the court allowed for costs on Lohman's failed FPA claim, it determined that respondents were not entitled to costs related to the other five causes of action Lohman raised under the FEHA, finding that respondents did not meet their burden to establish that Lohman's claims were

_____

[7] Lohman does not argue that the trial court erred in granting summary judgment on her cause of action under the Fair Pay Act.

27

frivolous, unreasonable, or without foundation. Thus, the trial court equitably apportioned the claimed amount of costs, allowing respondents to recover $10,082, or one-sixth of their claimed costs. Lohman asserts that the trial court erred when it interpreted and applied the relevant statutes.

Code of Civil Procedure section 1032, subdivision (b) provides, "Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." Lohman argues on appeal that Labor Code section 1197.5, subdivision (h)[8] creates an exception to that general rule in claims made pursuant to section 1197.5, California's equal pay law. Thus, she contends the trial court erred in ordering her to pay respondents' costs related to her cause of action for violation of section 1197.5.

We generally review an award of attorney fees and costs for abuse of discretion; however, where the determination of whether a party requesting costs meets the criteria for such an award requires statutory construction or presents a question of law, we review the order de novo. (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175; *Carver v. Chevron US.A., Inc.* (2002) 97 Cal.App.4th 132, 142.)

Section 1197.5, subdivision (a) precludes an employer from paying "any of its employees at wage rates less than the rates paid to employees of the opposite sex for substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions," without making a specific showing as set forth in the statute. The trial court granted summary adjudication on Lohman's cause of action under section 1197.5, which she has not appealed. Thus, the sole question before us is whether the trial court properly awarded respondents costs as the prevailing party on the cause of action.

---

[8] Further statutory references are to the Labor Code unless otherwise noted.

28

Section 1197.5, subdivision (h) states, "An employee receiving less than the wage to which the employee is entitled under this section may recover in a civil action the balance of the wages, including interest thereon, and an equal amount as liquidated damages, together with the costs of the suit and reasonable attorney's fees, notwithstanding any agreement to work for a lesser wage." There is no provision of section 1197.5 expressly addressing when and if a prevailing employer can recover costs.

The trial court found that section 1197.5 "[did] not provide an 'express' exception to the general rule permitting an employer, as a prevailing party, to recover costs pursuant to [Code of Civil Procedure section] 1032[, subdivision] (b)," citing *Plancich v. United Parcel Service, Inc.* (2011) 198 Cal.App.4th 308 (*Plancich*). On appeal, Lohman contends the trial court erred in so construing section 1197.5, arguing that the plain language of section 1197.5, read under well-established principles of statutory construction, is evidence of the Legislature's intent to preclude an award of costs to a prevailing employer.

" 'It is well settled that the proper goal of statutory construction "is to ascertain and effectuate legislative intent, giving the words of the statute their usual and ordinary meaning. When the statutory language is clear, we need go no further." ' [Citation.] We consider the language in the context of the entire statute and the statutory scheme of which it is a part [citation], harmonizing provisions relating to the same subject matter, to the extent possible [citation]." (*Satele v. Superior Court* (2019) 7 Cal.5th 852, 858-859.) Lohman argues that the clear statutory language of section 1197.5 only allows either prevailing employees (§ 1197.5, subd. (h)), or the Department of Labor Standards Enforcement, prosecuting on behalf of an employee (§ 1197.5, subd. (g)), to recover costs of suit. Lohman does not dispute that the statute does not expressly preclude a prevailing employer from recovering costs.

The trial court relied on *Plancich*, finding its analysis of section 1194 persuasive when applied to section 1197.5. In *Plancich*, the plaintiff unsuccessfully sued his

29

employer for failing to pay overtime compensation, among other causes of action. (*Plancich*, *supra*, 198 Cal.App.4th at p. 310.) When the employer sought to recover prevailing party costs, the plaintiff objected, claiming that section 1194, subdivision (a) precluded such an award. (*Id*. at p. 311.) That statute provides, "Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit." (§ 1194, subd. (a).) The trial court denied the employer's request, finding that allowing costs under Code of Civil Procedure section 1032, subdivision (b) would "eviscerate[]" "the public policy benefits of section 1194. . . ." (*Plancich*, at p. 312.) The appellate court disagreed with the trial court: "Section 1194 gives a prevailing *employee* the right to recover attorney's fees and costs; however, the statute makes no mention of prevailing *employers*. In other words, the statute does not contain express language excluding prevailing employers from recovering their costs; any suggestion that a prevailing employer is prohibited from recovering its costs is, at most, implied by the language of section 1194. [Citation.] Accordingly, based on the plain meaning of the words of the statutes in question, section 1194 does not provide an 'express' exception to the general rule permitting an employer, as a prevailing party, to recover costs under Code of Civil Procedure section 1032, subdivision (b), because section 1194 makes no mention of prevailing employers. [Citation.]" (*Plancich*, at p. 313.) The appellate court determined that allowing the employer to recover costs would not render section 1194 inoperative or meaningless, because the statute authorized a prevailing employee to recover not only costs, but also attorney's fees. (*Id*. at pp. 313-314.)

Lohman argues that the *Plancich* holding has been rejected by more recent cases, and is at odds with a later Supreme Court decision finding that section 1194 is a "one-way fee-shifting provision." (*Kirby v. Immoos Fire Protection* (2012) 53 Cal.4th 1244,

1248 (*Kirby*).)[9]  In *Ling v. P.F. Chang's China Bistro, Inc.* (2016) 245 Cal.App.4th 1242, 1253 (*Ling*), disapproved on other grounds in *Naranjo v. Spectrum Security Services, Inc.* (2022) 13 Cal.5th 93, 117, this court found that, "Because section 1194 provides only for a successful plaintiff to recover attorney's fees and costs, it is a one-way fee shifting statute precluding an employer from collecting fees and costs even if the employer prevails on a minimum wage or overtime claim.  (*Earley v. Superior Court* (2000) 79 Cal.App.4th 1420, 1425, 95 Cal.Rptr.2d 57 (*Earley*).)"  In doing so, we noted that an award of fees to an employer "conflicted with the public policy embedded in section 1194," and that the "one-way fee-shifting statute [precluded the employer] from recovering fees under any circumstance."  (*Ling*, at pp. 1254-1255.)

As explained in *Earley*, "the Legislature clearly intended to give special treatment to overtime compensation claims and to create a one-way fee-shifting right for a successful employee; but no similar right was recognized for an employer who successfully defended such a claim."  (*Earley*, *supra*, 79 Cal.App.4th at p. 1428.)  Citing the public policies supporting the overtime wages laws, the *Earley* court determined that the one-way fee-shifting provision of section 1194 encouraged injured employees " 'to seek redress–and thus simultaneously enforce [the minimum wage and overtime laws]–in situations where they otherwise would not find it economical to sue.' [Citation.]  To allow employers to invoke [cost recovery statutes] in an overtime case would defeat that legislative intent and create a chilling effect on workers who have had their statutory rights violated.  Such a result would undermine statutorily-established public policy.

---

[9] In *Kirby*, the Supreme Court focused its discussion not on whether section 1194 was a one-way fee shifting provision, but instead on whether the attorney's fees provisions of sections 1194 and 218.5 authorized the trial court to award fees to a prevailing party in a section 226.7 action for an alleged failure to provide rest breaks. (*Kirby*, *supra*, 53 Cal.4th at p. 1250.)  Thus, the court did not provide analysis for its conclusion that section 1194 was a one-way fee shifting provision, except to cite to *Earley v. Superior Court* (2000) 79 Cal.App.4th 1420, 1429.  (*Kirby*, at p. 1251.)

That policy can only be properly enforced by a recognition that section 1194 alone applies to overtime compensation claims." (*Id.* at pp. 1430-1431.) Thus, based on the public policy statements articulated in *Earley*, this court found in *Ling* that an arbitration award allowing a plaintiff to recover prevailing party costs under Code of Civil Procedure section 1032 exceeded the arbitrator's power because it contravened the public policy embedded in section 1194. (*Ling*, *supra*, 245 Cal.App.4th at p. 1255.)

In a recent decision, Division 1 of the Fourth District Court of Appeal agreed with the holding in *Ling*. "[P]ursuant to the authority of *Ling*, *supra*, 245 Cal.App.4th at page 1253, 200 Cal.Rptr.3d 230, Code of Civil Procedure section 1032 does not apply where the fee and cost provisions of sections 1194 or 218.5 apply." (*Cruz v. Fusion Buffet, Inc.* (2020) 57 Cal.App.5th 221, 241, review den. (Feb. 10, 2021) (*Cruz*).)[10] In doing so, the *Cruz* court expressly disagreed with the analysis undertaken by the *Plancich* court, instead agreeing with *Earley* and *Ling* that interpreting section 1194 as a one-way cost-shifting provision served the public policy of the statute. "This public policy is not served by allowing for a more general cost-shifting provision, such as that expressed in Code of Civil Procedure section 1032, to apply to require the shifting of costs in favor of a prevailing defendant employer; section 1194 speaks only to entitling a prevailing plaintiff employee to costs and fees. We decline to interpret section 1194's silence with respect to prevailing employers as anything other than a Legislative intention to provide a one-way cost and fee shifting provision." (*Cruz*, at p. 242.)

Lohman argues that the public policy underlying the rulings in *Earley*, *Ling*, and *Cruz*—namely providing a disincentive to violation of labor laws—similarly supports a conclusion that section 1197.5 is a one-way fee shifting provision precluding prevailing employers from recovering costs. Respondents contend that *Earley*, *Ling* and *Cruz*

_____

[10] As the ruling in *Cruz* came out after this matter was fully briefed, we invited the parties to provide supplemental briefing addressing the effect of that decision on the appeal.

ignore the clear language of Code of Civil Procedure section 1032 which states that its prevailing party costs provisions apply unless there is an express statute to the contrary; neither section 1194 nor section 1197.5 include an express provision precluding prevailing employers from recovering costs. They rely on the Supreme Court's decision in *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985 (*Murillo*). In *Murillo*, the Supreme Court determined that a provision in the so-called "automobile 'lemon law' " allowing a prevailing buyer/plaintiff to recover costs under Civil Code section 1794, subdivision (d), did not expressly preclude a prevailing seller/defendant from recovering costs under Code of Civil Procedure section 1032. (*Murillo*, at pp. 990-991.) The court rejected the public policy argument proffered by the buyer, stating that it could not say that "allowing a seller to recover costs when it prevails would undermine the Legislature's purpose. To the extent buyer contends the playing field should be tilted even more in favor of consumers, that argument is more properly addressed to the Legislature." (*Id.* at pp. 993-994.)

In *Murillo* the Supreme Court addressed commercial transactions between buyers and sellers of automobiles. But in the context of recoverable fees in actions between employees and employers under the Labor Code, the Supreme Court has since recognized one-way fee and cost-shifting provisions, despite the absence of an express declaration in the statute precluding recovery by the employer. (See *Kirby*, *supra*, 53 Cal.4th at p. 1248.) Thus, *Murillo* does not preclude this court from similarly finding that section 1197.5 is a one-way cost-shifting provision.

We perceive no meaningful distinction between sections 1194 and 1197.5. As with section 1194, the articulated public policy underlying section 1197.5 demonstrates the Legislature's intent that only prevailing employees should recover costs. "The Equal Pay Act exists to ensure that employees performing equal work are paid equal wages without regard to gender." (*Hall v. County of Los Angeles* (2007) 148 Cal.App.4th 318, 323.) In 2015, the Legislature recognized that, "California has prohibited gender-based

33

wage discrimination since 1949. Section 1197.5 of the Labor Code was enacted to redress the segregation of women into historically undervalued occupations, but it has evolved over the last four decades so that it is now virtually identical to the federal Equal Pay Act of 1963 (29 U.S.C. Sec. 206(d)). However, the state provisions are rarely utilized because the current statutory language makes it difficult to establish a successful claim." (Stats. 2015, ch. 546, § 1(c).) Although California's wage gap in 2015 was lower than the national average, "the persistent disparity in earnings still has a significant impact on the economic security and welfare of millions of working women and their families. . . . The wage gap contributes to the higher statewide poverty rate among women, which stands at 18 percent, compared to approximately 15 percent for men, and the poverty rate is even higher for women of color and single women living with children." (*Id*. at §1(b).) In determining that section 1197.5 required an award of attorney fees to a prevailing employee, the Supreme Court has acknowledged that, "[m]ost Employers in employment discrimination suits can more readily afford a protracted discrimination suit than can their employees. The mandatory award of attorney's fees encourages aggrieved employees to pursue meritorious but expensive claims, some (like the instant claim) involving lost pay awards which are small compared to the plaintiff's attorney's fees." (*Jones v. Tracy School Dist.* (1980) 27 Cal.3d 99, 111.)

As is the case with section 1194, interpreting section 1197.5 to include a one-way cost-shifting provision encourages employees to seek redress and simultaneously enforces the fair pay laws in situations where employees might otherwise not find it economical to sue. Allowing employers to invoke Code of Civil Procedure section 1032 to recover costs would defeat the legislative intent and discourage workers from bringing suit who have had their statutory rights violated. (See *Earley*, *supra*, 79 Cal.App.4th at pp. 1430-1431.) We thus conclude that Code of Civil Procedure section 1032 does not apply in actions under section 1197.5. We will reverse the cost award accordingly.

34

### III.   DISPOSITION

The judgment entered November 6, 2018, is affirmed (appeal No. H046681).

The March 19, 2019 order denying Lohman's motion to strike or tax costs in part is reversed (appeal No. H046831).

_____

Greenwood, P. J.


WE CONCUR:



_____

Lie, J.







_____

Wilson, J.






H046681/ H046831
Lohman v. City of Mountain View et al.